

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JONES DAY, <br> a General Partnership, | ) <br> ) <br> ) | Case No. **1:06CV1174** <br> <br> Judge: **MAG. JUDGE BAUGHMAN** |
| Plaintiff, | ) <br> ) | **JUDGE OLIVER** |
| v. | ) <br> ) <br> ) | |
| MAVERICK LLC, <br> a Florida Limited Liability Company, | ) <br> ) <br> ) | COMPLAINT <br> AND JURY DEMAND |
| Defendant. | ) | |

COMES NOW, the Plaintiff, Jones Day, and for its Complaint against the Defendant, alleges as follows:

### NATURE OF THE ACTION

1. This is a civil action brought by Jones Day to cease the Defendant's service mark dilution, tortious interference with economic relations and trade disparagement.

Dockets.Justia.com

## PARTIES, JURISDICTION AND VENUE

2. At all times relevant hereto, Plaintiff, Jones Day, was and is a general partnership engaged in the profession and practice of law with its principal office in Ohio located at 901 Lakeside Avenue, Cleveland, Ohio 44114.

3. At all times relevant hereto, upon information and belief, the Defendant, Maverick LLC ("Maverick"), was and is a Florida limited liability company with a principal place of business located at 102 W. Whiting Street, #201, Tampa, Florida 33602.

4. This Court has jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338. This Court has jurisdiction over Jones Day's common law claims pursuant to 28 U.S.C. §§ 1332 and 1367.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) in that the Defendant is a corporation subject to personal jurisdiction in this District, the intellectual property which is the subject of this dispute is located in this District, and a substantial part of the events giving rise to the claims at issue occurred in this District. Jones Day is also suffering from the effects of Defendant's conduct in this District.

6. Defendant has directed business efforts to the State of Ohio and has purposefully directed its unlawful activities to the State of Ohio.

## FACTS COMMON TO ALL COUNTS

7. Tracing its origins to 1893 in Cleveland, Ohio, Jones Day is one of the world's largest and most famous law firms, with more than 2,200 lawyers resident in 30 geographically diverse locations, worldwide.

8. In the United States, Jones Day maintains offices in Atlanta, Georgia; Chicago, Illinois; Cleveland, Ohio; Columbus, Ohio; Dallas, Texas; Houston, Texas; Irvine, California;

Los Angeles, California; Menlo Park, California; New York, New York; Pittsburgh, Pennsylvania; San Diego, California; San Francisco, California; and Washington, D.C.

9. Jones Day's international practice is also significant and expanding. In addition to representing a large number of its United States-based clients in international matters, Jones Day represents many major companies based in Europe, the Middle East, Asia, and Latin America. Jones Day maintains a significant presence in the principal legal and regulatory capitals of the world. In Europe, more than 340 lawyers are based in Brussels, Belgium; Frankfurt, Germany; London, England; Madrid, Spain; Milan, Italy; Moscow, Russia; Munich, Germany; and Paris, France. In Asia, more than 150 lawyers are based in Beijing, China; Hong Kong, People's Republic of China; Shanghai, China; Singapore; Taipei, Taiwan; and Tokyo, Japan. Jones Day also has offices in Sydney, Australia.

10. Jones Day is fortunate to have been selected to act as principal outside counsel to, or provide significant legal representation for, more than half of the *Fortune* 500 companies, as well as to a wide variety of other entities, including privately held companies, financial institutions, investment firms, health care providers, retail chains, foundations, educational institutions, and individuals.

11. Surveys repeatedly list Jones Day as one of the law firms most frequently engaged by domestic corporations, and many of the Firm's lawyers have achieved national recognition in their disciplines. Jones Day has been ranked first among litigation departments in the United States, and consistently ranks among the finest litigation departments in the United States.

12. In October 2005, Jones Day, for the third time in five years, topped the BTI Consulting Group's National Survey of Client Service Performance for Law Firms. Jones Day

is one of only two law firms honored in 2005 as a member of the BTI Client Service Hall of Fame. This exclusive list includes law firms that clients rank in the BTI Client Service Top Ten for five years in a row.

13. Jones Day is the owner of two United States Service Mark Registrations, Numbers 2,316,539 and 2,212,877, for the mark JONES DAY in connection with "Legal Services" (collectively the "Jones Day Marks"). The Jones Day Marks are incontestable. Copies of these Registrations are attached hereto as Exhibits A and B respectively.

14. As a result of the high quality of legal services it has provided to its clients for more than a century and its reputation as one of the premier law firms in the United States, if not the world, Jones Day's name and service marks have become very valuable assets and are famous. Since at least as early as July 1983, Jones Day has used the service mark JONES DAY to identify the legal services the Firm provides. The Firm has used the service mark JONES DAY in commerce in various other forms since at least 1939.

15. Since 1983, Jones Day has spent millions of dollars marketing its services worldwide using the Jones Day Marks. As a direct result of the time and effort promoting the Jones Day Marks, Jones Day's clients, its competitors and the general public have come to associate high quality legal services provided by Jones Day by its use of the name and service mark JONES DAY in both word and stylized forms.

16. Jones Day vigorously protects its rights in and to the Jones Day Marks. For example, in March 2000, Jones Day sued a cybersquatter who had registered and was using website domain names that incorporated the Jones Day Marks. Judge Nugent of the United States District Court for the Northern District of Ohio enjoined that cybersquatter from posting any content on websites at the domain names "www.jonesdayreavis.com,"

4

"www.jonesdayreavispogue.com," and "www.jonesdayreavisandpogue.com" or from registering any domain name that is identical or confusingly similar to any registered or common law service mark of Jones Day, including but not limited to, the Jones Day Marks.

17. A similar result was reached in November, 2005. Jones Day sued an individual who had registered and was using www.jonesdays.com to disparage Jones Day. Judge Economus of the United States District Court for the Northern District of Ohio enjoined that individual from posting any content on the web site located at www.jonesdays.com, from registering any domain name that is identical or confusingly similar to any registered or common law service mark of Jones Day, including, but not limited to, the Jones Day Marks, and from engaging in any conduct which dilutes or infringes Jones Day's rights in and to the Jones Day Marks. Jones Day also was awarded costs, statutory damages and attorneys' fees.

## DEFENDANT'S UNLAWFUL CONDUCT

18. Defendant owns and operates the internet web site www.maverickllc.com (the "Web Site"). Attached hereto as Exhibit C, and incorporated herein by reference, are true and correct screenshots of the Web Site that an internet user sees when it types in the domain name www.maverickllc.com.

19. Defendant uses the Web Site to promote its services and to solicit potential customers. For instance, the Web Site features a program called "The Maverick Minute ™" which promotes Defendant's business on XM® Satellite Radio. See Exhibit C.

20. Exhibit C also demonstrates that Defendant, in an attempt to capitalize on recent corporate scandals, produced and created a marketing video entitled "Our House, Up the River From Wall Street" (the "Marketing Video").

5

21. Defendant has used, and continues to use, the Marketing Video to promote its "custom designed Ethics Training, Behavioral Profiling and Enterprise-wide Cultural Assessment." See Exhibit C.

22. The Marketing Video is intended to spotlight "corporate skullduggery and political corruption that will re-focus America's attention on the long running scandals of executive greed, malfeasance and the betrayal of shareholder and public trust in the corporate, lobbying, and political worlds." See Exhibit C.

23. To spotlight "corporate skullduggery and political corruption," the Marketing Video uses corporate names, and images of individuals, involved in, or accused of, scandalous and unethical behavior, such as Enron, Arthur Andersen, SunCruz Casinos, Jack Abramoff, Dennis Kozlowski, Bernie Ebbers and Tom Delay. Attached hereto as Exhibit D, and incorporated herein by reference, are true and correct excerpts of still shots taken from the Marketing Video.

24. The Marketing Video is initially set to the Crosby, Stills Nash and Young song "Our House" with modified lyrics. The Marketing Video also uses the song by Madness entitled "Our House" with modified lyrics. In addition to the music, the Marketing Video is composed of a text portion and an image portion.

25. In the text portion of the Marketing Video, Defendant uses altered lyrics to both "Our House" songs, which appear at the bottom of the screen. Along with the altered lyrics appears the slogan "Maverick think. change. think again" and the address for the Web Site. Both the slogan and the address for the Web Site are always present in the text portion of the Marketing Video. See Exhibit D.

26. In the image portion of the Marketing Video, Defendant also spotlights its name and promotes its business. For instance, the backdrop in the image portion is often composed of a collection of the Defendant's slogan "Maverick think. change. think again." In addition, as the altered lyrics of the song, "Jailbirds in a Maverick minute...Corner office gone," are sung and printed, in the background a poster for "The Maverick Minute ™" XM® Satellite Radio program appears. See Exhibit D.

27. Defendant uses the content of the Web Site and the Marketing Video to solicit customers by highlighting its name and services. On the Web Site and in the Marketing Video, Defendant indirectly and directly claims that its services can help customers avoid the scandalous and unethical behavior exhibited in the Marketing Video. For example, on the page of the Web Site where the Marketing Video is made available, Defendant states "[f]or information about how Maverick can help you determine whether or not your organization's culture may be facilitating unethical behavior, or just turning a blind eye to it, please contact Bill Stark at 866.688.7223 x 706." See Exhibit C.

28. Appearing prominently in the Marketing Video are the Jones Day Marks. See Exhibit D. Specifically, the Marketing Video opens with the lyrics, "I'll shred the files, you place the lawyers On the case we retained at Jones Day" scrolled along the bottom of the screen. Prominently featured in the background, while these lyrics are sung and as these lyrics appear, are the Jones Day Marks. See Exhibit D.

29. The Marketing Video is false and disparages Jones Day and the Jones Day Marks. As depicted in Exhibit D, the Marketing Video falsely associates Jones Day and the Jones Day Marks with unethical behavior (e.g., shredding files) and companies and individuals with scandalous reputations and accused of unethical behavior (e.g., Enron and Jack Abramoff).

7

30. Jones Day does not currently represent Enron, and has not represented Enron in connection with any of the unethical and unlawful behavior referenced in the Marketing Video.

31. Jones Day does not currently represent Arthur Andersen, and has not represented Arthur Andersen in connection with any of the unethical and unlawful behavior referenced in the Marketing Video.

32. At no time has Jones Day represented SunCruz Casinos, which is featured in the Marketing Video.

33. At no time has Jones Day represented Jack Abramoff, who is featured in the Marketing Video.

34. At no time has Jones Day represented Dennis Kozlowski, who is featured in the Marketing Video.

35. At no time has Jones Day represented Bernie Ebbers, who is featured in the Marketing Video.

36. At no time has Jones Day represented Tom Delay, who is featured in the Marketing Video.

37. Third parties who have seen the Marketing Video acknowledge that Defendant's use of the Jones Day Marks is disparaging Jones Day and the goodwill associated with the Jones Day Marks. Attached hereto as Exhibit E, are true and correct copies of screenshots from "The Brad Blog" which appear on the web site http://www.bradblog.com. "The Brad Blog" is a left-of-center political web log that appears to focus on criticism of the Republican Party, the Bush Administration and perceived irregularities in various electronic voting systems.

38. "The Brad Blog" contains the screen shot from the Marketing Video prominently featuring the Jones Day Mark. A caption below the screen shot states "Abramoff, DeLay,

8

Cunningham, Enron, Tyco, Jones Day, Sun Cruz...What more could you want in a Parody Music Video?! (Well, Diebold, ES&S and Sequoia maybe? We'll go ahead and give 'em credit for all of the above due to their inclusion of Jones Day. It's the least we can do.)." See Exhibit E.

39. Indeed, Defendant has admitted that it is aware of the false and disparaging nature of the Marketing Video, and the harm caused to Jones Day and the Jones Day Marks:

> I was as taken aback as you and Warren to learn that certain blogs have created a non-existent connection between "Our House" and Diebold and Jones Day, and that they are inferring any negative connotation about Jones Day from the video parody. Our intent, first and foremost was to portray Jones Day in a positive light-after all the firm does serve as white collar criminal defense attorneys. We thought the free publicity would be welcomed...With regard to the inclusion of Jones Day as the law firm ostensibly being retained by Enron in the parody, we will look into the possibility of removing the reference to JD...

A true and correct copy of an e-mail from Bill Stark (the Managing Partner of the Defendant) to My Linh Vu-Gregoire and dettinw@diebold.com is attached hereto at Exhibit F and is incorporated herein by reference.

40. Upon information and belief, the Marketing Video was created and produced in February, 2006.

41. Upon information and belief, in March, 2006, Defendant made copies of the Marketing Video into DVD format (the "Marketing DVD"). Copies of the Marketing DVD were widely distributed by Defendant throughout the United States, including to the State of Ohio, in an attempt to solicit business.

42. Upon information and belief, in April, 2006, Defendant made the Marketing Video available on the Web Site and encouraged potential customers to view and download the Marketing Video and purchase Defendant's ethics training services.

9

43. Jones Day did not become aware of the Marketing Video until on or about April 18, 2006.

44. After Jones Day became aware of the Marketing Video, it contacted Defendant on April 19, 2006, and requested that the Defendant cease all use of the Jones Day Marks. A true and correct copy of Jones Day's April 19, 2006 correspondence to Defendant is attached hereto at Exhibit G and is incorporated herein by reference.

45. Jones Day did not receive a response to its April 19, 2006 correspondence. On May 1, 2005. Jones Day again contacted Defendant and requested that the Defendant cease all use of the Jones Day Marks. A true and correct copy of Jones Day's May 1, 2006 correspondence to Defendant is attached hereto at Exhibit H and is incorporated herein by reference.

46. The first response Jones Day received to its demand that Defendant cease its unlawful and disparaging use of the Jones Day Marks, was an e-mail from Defendant's Managing Partner Bill Stark, dated May 2, 2006. A true and correct copy of that e-mail from Bill Stark to mwilkes@jonesday.com is attached hereto at Exhibit I, and is incorporated herein by reference.

47. As set forth in Exhibit I, not only does Mr. Stark fail to address Defendant's unlawful and disparaging use of the Jones Day Marks, but also attempts to solicit business from Jones Day by using the Marketing Video, "[t]o that end, we'll be happy to provide you with a DVD for every JD office location. And, we're sure your clients would enjoy seeing the video, too. We'd be delighted to provide JD with up to several hundred copies for distribution to your largest corporate clients."

48. Subsequently, Jones Day responded stating it had no interest in the Marketing Video and again demanded that Defendant cease its unlawful and disparaging use of the Jones Day Marks. A true and correct copy of that May 2, 2006 e-mail from Meredith M. Wilkes to billstark@maverickllc.com is attached hereto at Exhibit J, and is incorporated herein by reference.

49. On May 2, 2006 Defendant responded by e-mail stating it would remove its use of the Jones Day Marks only upon a written promise by Jones Day to forgo any legal action against Defendant. A true and correct copy of that e-mail from Bill Stark to mwilkes@jonesday.com is attached hereto at Exhibit K, and is incorporated herein by reference.

50. Again on May 2, 2006 Jones Day again demanded that Defendant cease all use of the Jones Day Marks and demanded that Defendant cease using the Marketing Video. A true and correct copy of that e-mail demand from Meredith M. Wilkes to billstark@maverickllc.com is attached hereto at Exhibit L, and is incorporated herein by reference.

51. Defendant responded by e-mail on May 2, 2006 by stating it would "carefully consider" the demands of Jones Day. A true and correct copy of that e-mail from Bill Stark to mwilkes@jonesday.com is attached hereto at Exhibit M, and is incorporated herein by reference.

52. In response, Jones Day gave Defendant 24 hours to cease its unlawful and disparaging use of the Jones Day Marks. A true and correct copy of that May 2, 2006 e-mail response from Meredith M. Wilkes to billstark@maverickllc.com is attached hereto at Exhibit N, and is incorporated herein by reference. Jones Day did not receive any response from Defendant.

53. Rather than respond to Jones Day, upon information and belief, Defendant, realizing that it was disparaging Jones Day and the Jones Day Marks, modified the Web Site. At

some point after April 27, 2006 Defendant altered the Web Site and added the following language: "THERE IS NO REAL WORLD CONNECTION BETWEEN JONES DAY AND ENRON OR ARTHUR ANDERSON [sic]." Attached hereto as Exhibit O, and incorporated herein by reference, is a true and correct copy of a version of the Web Site as it existed on May 8, 2006. Attached hereto as Exhibit P, and incorporated herein by reference, is a true and correct copy of a version of the Web Site as it existed on April 27, 2006.

54. The alleged disclaimer does not appear on the screen when an internet user accesses the Web Site. A user must click on the link to the Marketing Video and then scroll to the bottom right hand column on that page to see the alleged disclaimer.

55. The alleged disclaimer does not appear in the Marketing Video, nor is it part of the lyrics as they appear at the bottom of the screen.

56. Rather than cease its unlawful and disparaging use of the Jones Day Marks, upon information and belief, Defendant further promoted and solicited business and further disseminated the Marketing Video by contacting its local newspaper. Attached hereto as Exhibit Q, and incorporated herein by reference, is a true and correct copy of a May 4, 2006 St. Petersburg Times' Article (the "Article").

57. The Article makes it clear that Defendant created the Marketing Video and is using the Jones Day Marks in the hopes that it would create a significant increase in its consulting business and lead to financial gain. "Bill Stark hoped his music video parody of corruption icons like Jack Abramoff and Enron would bring his tiny Tampa company fame, [and] consulting deals..." See Exhibit Q.

58. The Article makes it clear that Defendant included Jones Day and the Jones Day Marks in the Marketing Video, in part, in hopes that such use might "even earn Maverick a juicy consulting deal" from Jones Day. See Exhibit Q.

59. The Article demonstrates that the Marketing Video is false. "In fact, Jones Day has no known involvement with Enron, Arthur Andersen or any other recent scandal icons." See Exhibit Q.

60. Defendant does not intend to cease its unlawful and disparaging use of the Jones Day Marks.

61. Jones Day has never authorized Defendant to use any intellectual property owned by Jones Day, including the Jones Day Marks.

62. As of the date of the filing of this Complaint, Defendant has failed to cease its unauthorized unlawful and disparaging use of the Jones Day Marks.

## COUNT I
## FEDERAL SERVICE MARK DILUTION, 15 U.S.C. § 1125(c)

63. Jones Day incorporates each and every allegation of Paragraphs 1-62 of this Complaint as though fully set forth herein.

64. The Jones Day Marks have acquired fame in the United States.

65. Defendant began using the Jones Day Marks after they became famous.

66. Defendant's use of the Jones Day Marks is diluting and blurring the distinctiveness of the Jones Day Marks.

67. Defendant's use of the Jones Day Marks is disparaging the distinctiveness of the Jones Day Marks.

68. Defendant has diluted the famous Jones Day Marks.

13

69. Defendant will continue its acts of dilution causing irreparable injury to Jones Day, unless such activities are enjoined by this Court.

70. As a direct and proximate result of Defendant's acts of dilution, Jones Day has and continues to suffer damages in an amount that is not presently ascertainable but will be established at trial. Jones Day is entitled to all available remedies provided for in 15 U.S.C. §§ 1117, 1118 and 1125, including preliminary and permanent injunctive relief, Defendant's profits, treble damages, costs and reasonable attorneys' fees.

## COUNT II
## TRADE DISPARAGEMENT UNDER OHIO COMMON LAW

71. Jones Day incorporates each and every allegation of Paragraphs 1-70 of this Complaint as though fully set forth herein.

72. The statements regarding Jones Day's services set out in Paragraphs 28 and 29 and Exhibit D of this Complaint are false and defamatory, have exposed Jones Day's services to ridicule and contempt, and have injuriously affected Jones Day's trade and business.

73. The statements were made in bad faith with actual malice and were intended to injure the reputation of Jones Day and the quality of the services Jones Day provides. Defendant made the statements with knowledge that they were false or with reckless disregard to their truth or falsity.

74. The false statements were published to third parties that understood the defamatory meaning of the statements.

75. As a direct and proximate result of Defendant's false and malicious statements, Jones Day has and continues to suffer economic injury, loss of good will, injury to the reputation of its services, disparagement as to the quality of its services, and is otherwise damaged.

14

76. As a result of Defendant's misrepresentations, Jones Day has suffered and will continue to suffer irreparable harm as described elsewhere herein, in the form of damages of types that may be difficult or impossible to quantify.

77. Defendant's actions evidence a likelihood that it will repeat its misrepresentations in the future, threatening continued irreparable harm to Jones Day.

78. The statements made by Defendant were made with ill will toward Jones Day. Defendant's aforementioned acts were done maliciously and with reckless indifference as to their consequences. As such, Jones Day is entitled to punitive and exemplary damages in amounts to be determined according to the proof at trial.

## COUNT III
## TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS

79. Jones Day incorporates each and every allegation of Paragraphs 1-78 of this Complaint as though fully set forth herein.

80. Jones Day has a valid business expectancy to continue to perform legal services for its clients.

81. Defendant intentionally interfered with Jones Day's valid business expectancy in and to its clients by making false statements regarding Jones Day and associating Jones Day with unethical and scandalous behavior.

82. Defendant's acts described above were intended to diminish and harm the reputations and business prospects of Jones Day, and interfere with its existing and future economic and business relationships with its clients.

83. Defendant's intentional and wanton interference with Jones Day's business relationships was done knowingly, deliberately, maliciously, and without any excuse,

justification, or privilege. Defendant's conduct was not done to protect its own legitimate interests.

84.     As a direct and proximate result of Defendant's intentional, willful and malicious interference with Jones Day's valid business expectancy, Jones Day has and continues to suffer damages in an amount which is not presently ascertainable, but will be proven at trial.

85.     As a result of Defendant's actions, Jones Day has suffered and will continue to suffer irreparable harm as described elsewhere herein, and has no adequate remedy at law.

86.     Defendant's actions evidence a likelihood that it will repeat its conduct in the future, threatening continued future irreparable harm to Jones Day.

WHEREFORE, Jones Day prays that this Court enter an Order:

A.     Preliminarily and permanently enjoining Defendant, or anyone else acting in concert with it, or on its behalf, from:

1.     Using any reproduction or colorable imitation of the Jones Day Marks, or any mark confusingly similar thereto;

2.     Engaging in any other conduct that suggests or tends to suggest to the public that Defendant is in any manner, directly or indirectly affiliated, connected or associated with Jones Day or that the Defendant's services, goods or commercial activities originate from or are sponsored or approved by Jones Day;

B.     Requiring Defendant to account to Jones Day for all profits made by it in connection with any and all commercial activity relating to its use of the Jones Day Marks;

C.     Awarding to Jones Day the damages it sustained as a result of Defendant's wrongful acts;

D. Awarding to Jones Day, Defendant's profits pursuant to 15 U.S.C. § 1117;

E. Awarding to Jones Day treble damages pursuant to 15 U.S.C. § 1117;

F. Awarding to Jones Day its costs and attorneys' fees pursuant to 15 U.S.C. § 1117;

G. Awarding to Jones Day, punitive damages as a result of Defendant's wrongful acts; and

H. Granting Jones Day any further relief that the Court deems to be just and proper.

## JURY DEMAND

Jones Day respectfully requests a trial by jury on all issues triable thereby.

Dated: May 11, 2006

Respectfully submitted,

By: _____
Robert P. Ducatman (0003571)
Meredith M. Wilkes (0073092)
James W. Walworth, Jr. (0074174)
Ashlie E. Case (0079477)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
(216) 586-3939 Telephone
(216) 579-0212 Facsimile
rducatman@jonesday.com
mwilkes@jonesday.com
jwwalworthjr@jonesday.com
aecase@jonesday.com

**ATTORNEYS FOR PLAINTIFF
JONES DAY**